**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DANIELLE PICKETT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 07 C 1722 |
| | ) |
| SHERIDAN HEALTH CARE CENTER, | ) Judge Rebecca R. Pallmeyer |
| | ) |
| Defendant. | ) |

**MEMORANDUM ORDER**

Plaintiff Danielle Pickett, who works in the housekeeping staff at Defendant Sheridan Health Care Center ("Sheridan"), alleges that she was sexually harassed by residents at Sheridan and discharged in June 2006, in retaliation for her complaints about the harassment. Sheridan rehired Plaintiff some months later. In this action under Title VII, Sheridan has moved for summary judgment and, for the reasons explained here, the motion is granted in part, and denied in part.

**FACTS**[1]

Defendant, Sheridan Health Care Center, operates a nursing home in Zion, Illinois. LR 56.1 ¶ 1.) Plaintiff was hired to work at Sheridan in January 2005 as a dietary aide; in September 2005, she was transferred to a housekeeping position at her own request. (LR 56.1 ¶¶ 4-6.) At the time of the events at issue here, her hourly rate was $7.65. (Pl.'s 56.1 ¶1.)

Three distinct incidents are the bases for Plaintiff's sexual harassment claim, each one involving a nursing home resident. The first incident occurred in November 2005, while Plaintiff was cleaning the room of a resident ("R1") who lived on the second floor and was confined to a wheelchair. (LR 56.1 ¶ 11.) Plaintiff asserts that R1 made inappropriate sexual comments to her:

---

[1] The facts are set forth in the Defendant's Local Rule 56.1 Statement of Material facts ("LR 56.1"), in Plaintiff's Answer to Defendant's Local Rule 56.1 Statement of Material Facts (hereinafter "Ans. to LR 56.1"), in Plaintiff's Counter Statement of Material Facts as to Which There is No Genuine Issue ("Pl.'s 56.1"); and in Defendant's Response to Plaintiff's Counter Statement ("Def.'s Resp."). As required on this motion, the court draws inferences in favor of Plaintiff, the non-moving party.

he told her that he "would love to go down on a black woman," suggested that "[m]aybe we can hook up sometime, maybe we can have sex, satisfy each other's needs," and asked her if she was wearing "panties" as she exited his room. (Pl.'s 56.1 ¶¶ 4-6.) When questioned, the resident denied making any inappropriate statements, and there were no other witnesses to this incident. (LR 56.1 ¶¶ 10, 12.) It is undisputed, however, that in response to Plaintiff's allegations, Defendant conducted an investigation, counseled R1 about the alleged inappropriate behavior, and directed Pickett not to enter R1's room by herself. (LR 56.1 ¶¶ 12, 13.) Plaintiff was in fact accompanied by another staff member on three occasions; after about three weeks, however, Plaintiff became unwilling to wait for another staff member to accompany her into R1's room and instead adopted the practice of cleaning his room when R1 was not there. (LR 56.1 ¶ 15; Ans. to LR 56.1 ¶ 15.)[2]

The second incident of harassment occurred in either December 2005 or January 2006 and involved a second resident, "R2," who resides on the fourth floor. (LR 56.1 ¶¶ 16-17.) As Plaintiff entered a room to clean it, R2 stated to her, "Let me go in there and bang you." (Pl.'s 56.1 ¶ 16.) When Plaintiff stepped back out of the room, R2 turned to another resident and said, "She was watching me have sex with [another resident] and she wanted to join in. She liked it and wants me to do it with her." (Pl.'s 56.1 ¶ 17.) As Pickett continued her cleaning duties, R2 said, "Come here, let me squeeze that," followed Pickett in an aggressive manner despite her protests, and chased her down the hall. (Pl.'s 56.1 ¶¶ 18-20.) Another housekeeper stopped R2, and a pregnant Certified Nursing Assistant told R2 to leave Plaintiff alone. (Pl.'s 56.1 ¶¶ 21, 22.) He responded by saying, "Shut up before I bang bang bang you and make you have that baby." (Pl.'s 56.1 ¶ 22.) The situation appeared to have subsided in response to intervention from some nurses, but as

---

[2] Plaintiff claims that R1 continued to make sexual comments to her and asked her for sexual favors and that she reported the activity to Sheridan's Administrator, Ross Zeller. (Pl.'s 56.1 ¶¶ 12-14.) She offers no information regarding the dates, times, or content of these reports, however, did not mention them in her deposition, and has not even supported the assertion with her own affidavit. In any event, Plaintiff admits that after the November 2005 incident, she was instructed never again to enter R1's room by herself. (Ans. to LR 56.1 ¶ 14.)

Plaintiff bent down to help a resident open a soda, R2 approached her from behind and grabbed her crotch. (Pl.'s 56.1 ¶¶ 23-24.)

Plaintiff claims that when she reported this incident to her immediate supervisor, he asked her what it was that she was doing to prompt the inappropriate behavior. (Pl.'s 56.1 ¶¶ 25-26.) She acknowledges, however, that Sheridan staff counseled R2 regarding his misconduct, put him on a monitoring program, reported the incident to his physician (who adjusted his medication in response), and instructed Plaintiff that she was not to clean R2's room again. (LR 56.1 ¶ 18.) Plaintiff did in fact clean R2's room on some occasions later when R2 was away at a daytime workshop. (*Id.*)

The third incident of harassment also involved a nursing home resident, "R3." (LR 56.1 ¶ 20.) On June 24, 2006, just 11 days after R3 was admitted to the nursing home, R3 "stuck his finger out and aimed it at [Plaintiff's] breast" while she was cleaning his room. (LR 56.1 ¶¶ 20-21; Pl.'s 56.1 ¶ 28.) Then, as she was leaving his room, R3 rubbed a yellow "smiley face" sticker on her breast, and when she slapped his hand away, R3 grabbed her waist and squeezed her buttocks. (Pl.'s 56.1 ¶¶ 29, 30.)

Staff reported this incident to the police, and a police investigator spoke to Plaintiff the following day. (LR 56.1 ¶ 22(c); Pl.'s 56.1 ¶¶ 32, 33.) In addition, Defendant's staff counseled R3, and sent him to a hospital for evaluation. (LR 56.1 ¶ 22(a), (d).) Defendant directed its female staff to provide no care or services to R3 when alone, and reassigned Plaintiff herself to the first floor administrative office area, where there are no resident rooms. (LR 56.1 ¶ 22(e).)

On June 27, 2006, a meeting took place to discuss this incident. (Pl.'s 56.1 ¶ 38.) Plaintiff, her union steward, Diane Lee; Ross Zeller, the facility administrator; and Craig Barnes, Plaintiff's direct supervisor, were present. (*Id.*) The parties dispute what happened at this meeting. According to Plaintiff, Mr. Zeller told her that because she had not left the room after R3 touched her the first time she was, in effect, giving R3 permission to touch her again. (Pl.'s 56.1 ¶ 39.)

Zeller denies having stated or implied that inappropriate touching was acceptable; he recalls telling her that she should have left the room after the first incident of touching for her own safety and should report inappropriate conduct immediately to her supervisor. (Def.'s Resp. 56.1 ¶¶ 39, 41, citing Supplemental Declaration of Ross Zeller.)

On June 28, 2006, Pickett reported to work at approximately 7:00 am for her first scheduled day to work on the first floor. (LR 56.1 ¶ 23.) During a meeting, she told Zeller that "she did not feel safe, and felt as though she had been deceived regarding how offenders would be dealt with." (Pl.'s 56.1 ¶ 44.) In response, she claims that Zeller told her that if she could not handle "what is going on," she should find another job. (Pl.'s 56.1 ¶¶ 44-46.) Pickett began to cry because she felt Zeller was dismissing her concerns. (Pl.'s 56.1 ¶¶ 47-48.) At approximately 8:00 a.m., Plaintiff, upset, left work for the day without telling anyone. (Pl.'s 56,1 ¶¶ 47-48, LR 56.1 ¶ 24.) Defendant asserts that Plaintiff was terminated on June 30, 2006 for "walking off the job" on June 28. (LR 56.1 ¶ 26.) Plaintiff recalled, however, that Zeller called her at 9:50 a.m. and told her "I don't feel comfortable with you employed here since you aren't comfortable with what is doing on." He stated, further, that "Maybe it's best if you seek other employment," and "I think it's best if we part ways." (Pl.'s 56.1 ¶¶ 54, 56.) Plaintiff contends that she "knew and believed" she was fired for her complaints about the hostile work environment. (*Id.* ¶ 57.) She filed a charge of discrimination two weeks later. (*Id.* ¶ 58.)

Defendant offered to reinstate Plaintiff on four occasions, beginning on July 28, 2006. (LR 56.1 ¶¶ 27-28.) Plaintiff declined these offers because they did not include an offer of backpay, and because she understood that R3 remained at the facility. (Pl.'s 56.1 ¶ 60, 61.) In fact, R3 was sent to the hospital for five days from June 25 to June 30 and then was transferred out of the building permanently on July 31. (Def.'s Resp. ¶¶ 61, 62.) In January 2007, Plaintiff did accept Sheridan's offer to return to work. She currently works as a housekeeper assigned to the first floor. (LR 56.1 ¶ 28.) She was rehired at the collectively-bargained rate of $8.65 per hour. (Pl.'s 56.1

4

¶ 67; Def.'s Resp. ¶ 67.)

Sheridan maintains a written policy prohibiting sexual harassment, a copy of which Plaintiff received when she began working at Sheridan. (LR 56.1 ¶ 9.) Another written policy prohibits employees from leaving the premises during their work shift without permission of a supervisor, even during meals or break periods. (LR 56.1 ¶ 25.)

### DISCUSSION

Defendant seeks summary judgment on Plaintiff's sexual harassment claims and on her retaliation claims. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). To survive summary judgment, Plaintiff must identify sufficient evidence to sustain each element of the case she must prove at trial. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 787 (7th Cir. 2007). When considering a summary judgment motion, the court construes the facts and draws reasonable inferences in the light most favorable to the nonmoving party. *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir. 2004).

**I.  Sexual Harassment**

In order to establish a claim for sexual harassment, Pickett must establish that (1) she was subject to unwelcome harassment; (2) the harassment was based on her sex; (3) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile or offensive work environment; and (4) there is a basis for employer liability. *McPherson v. City of Waukegan*, 379 F.3d 430, 437-438 (7th Cir. 2004). Defendant argues, first, Defendant contends that it is entitled to summary judgment on Plaintiff's sexual harassment claim because agency principles do not permit a finding of liability for harassment by the nursing home residents. In any event, Defendant contends, the conduct was not sufficiently severe or pervasive and, when Plaintiff complained, Defendant promptly took appropriate steps to correct and prevent further misconduct.

Defendant's suggestion that it is not liable for harassment by nursing home residents appears to be at odds with recent Seventh Circuit authority. In *Erickson v. Wisconsin Dept. of Corrections,* 469 F.3d 600 (7th Cir. 2006), the court affirmed a jury verdict against the Wisconsin Department of Corrections and in favor of plaintiff, an employee at a Wisconsin prison, who was assaulted by a prison inmate. Whether or not the harasser was a co-worker, the court held, an employer may be "liable under Title VII's negligence standard if it 'failed to discover and prevent' sexual harassment of an employee giving rise to a hostile work environment." 469 F.3d at 606, quoting *Zimmerman v. Cook County Sheriff's Dep't.*, 96 F.3d 1017, 1018 (7th Cir. 1996).

Defendant's remaining arguments have more traction. First, Defendant contends that Plaintiff has not presented evidence that she was the victim of "conduct so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *McPherson*, 379 F.3d at 438 (citations and internal quotations omitted). To determine whether harassment renders the work environment both objectively and subjectively offensive, the court considers "all of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007), quoting *Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 902 (7th Cir. 2005). Plaintiff here complains not only of verbal threats and humiliation, but also of unwanted touching. The court is nevertheless reluctant, given the context of a nursing home providing care for residents with mental illnesses, to conclude that three instances of inappropriate resident conduct over the course of eight months are sufficiently severe or pervasive. *See Cain v. Blackwell*, 246 F.3d 758, 760 (5th Cir. 2001) ("clearly crude, humiliating, and insensitive" comments by an "elderly and obviously impaired" patient did not rise to the level of sexual harassment given the "unique circumstances" of the assisted living health care industry); *cf. EEOC v. Nexion Health at Broadway, Inc.*, 199 Fed. Appx. 351, 353-354, 2006 WL 2528432 (5th Cir. 2006) (repeated,

highly discriminatory comments by patient were not sufficiently severe or pervasive where conduct "consisted only of offensive utterances"); *Powell v. Morris*, 37 F. Supp. 2d 1011, 1018 (S.D. Ohio 1999) (in prison context, "[i]t is absurd to expect that a prison can actually stop all obscene comments and conduct from . . . people who have been deemed unsuited to live in normal society.")

In any event, even if Plaintiff establishes that the misconduct at issue here was severe or pervasive, the evidence does not support a conclusion that Sheridan is liable for it. Sheridan points to evidence that it took prompt and appropriate steps in response to Plaintiff's complaints. (Defendant's Memorandum in Support of its Motion for Summary Judgment ("Def.'s Mem."), at 11-14.) In response to the incident involving R1, Defendant conducted an investigation, counseled R1 about his alleged inappropriate behavior, and excused Plaintiff from entering his room alone. (LR 56.1 ¶¶ 12, 13.) After the incident involving R2, similarly, Sheridan counseled the resident, put him on a monitoring program, reported the incident to his treating physician and, again, instructed Plaintiff not to clean his room. (LR 56.1 ¶ 18.) Plaintiff's complaint about R3 resulted in Defendant's immediately counseling him, monitoring his conduct, and ultimately removing him from the facility. (LR 56.1 ¶ 22(a).) Plaintiff admits that Defendant instructed its female staff to provide no care or services to R3 while alone, that Zeller specifically advised her to avoid R3, and that Defendant reported the incident to the Zion police department. (LR 56.1 ¶ 22(a), (c); Pl.'s 56.1 ¶ 42.) Finally, following this last incident, Defendant changed Plaintiff's work area to the first floor administrative office area where there are no rooms for residents. (LR 56.1 ¶ 22(e).)

In *Saxton v. A T & T Co.*, 10 F.3d 526 (7th Cir. 1993), the court affirmed summary judgment for the employer where, after an employee complained of sexual harassment, the employer promptly conducted an investigation and separated her from the alleged harasser. Even where (as in the case before this court), the plaintiff believed her employer could have done more, the employer is entitled to summary judgment if its actions were "timely and reasonably likely to prevent the conduct . . . from recurring." *Id.* at 535. As did the employer in *Sexton*, it is undisputed that

Sheridan investigated each incident Pickett reported, counseled residents, and took other remedial steps.  (LR 56.1 ¶¶ 12-13, 18, 22(a), (c) & (e).)  Sheridan is entitled to summary judgment on Plaintiff's sexual harassment claim.

## II. Retaliation

Plaintiff's single-count complaint also raises a claim of retaliation: she contends she was terminated in retaliation for her complaints about harassment by the nursing home's residents. (Plaintiff's Answer Brief in Opposition to Defendant's Motion for Summary Judgment (hereinafter "Pl.'s Opp."), at 4, 7.)   Defendant did not address this claim in its memorandum in support of summary judgment, beyond arguing that Plaintiff was not discharged but instead walked off the job. (Def.'s Memo, at 14-15.)  In its Reply Memorandum, Defendant argues that Plaintiff has no direct evidence of retaliation and cannot prevail under the "indirect method" of proof.  (Reply Memorandum-Defendant's Motion for Summary Judgment (hereinafter "Def.'s Reply"), at 13-14.) As the court understands her argument, Plaintiff here chooses to rely on the "direct method" of proof (Pl's Opp., at 13-14), in which she can establish a violation of Title VII even without "direct evidence" by presenting "a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" *Rhodes v. Ill. Dept. of Trans.*, 359 F.3d 498, 504 (7th Cir. 2004), quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).  *See Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 905 (7th Cir. 2006) (suspicious timing of plaintiff's discharge, after positive performance evaluations, and a possible "set-up" for disciplinary action, constituted circumstantial evidence that plaintiff's termination was in retaliation for a complaint of sexual harassment).  Plaintiff here urges that "the proximity of the [final] complaint to the discharge, the lack of any quarrel over the plaintiff's work performance, the fact that plaintiff had complained three times about sexual harassment to management, all could lead a jury to return a verdict in plaintiff's favor."  (Pl.'s Opp., at 14.)

Plaintiff's discharge did fall closely on the heels of her complaints. (Pl.'s 56.1 ¶¶ 54-56.) Although suspicious timing is not sufficient by itself to establish retaliation, it is circumstantial evidence of a retaliatory motive. *Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 849 (7th Cir. 2007), citing *Boumehdi*, 489 F.3d at 793. The lack of any performance issues up to that time (Pl.'s Opp., at 14) bolsters her claim. *See Sylvester*, 453 F.3d at 905.

Sheridan argues that it had a legitimate reason to terminate Pickett because she walked off the job in violation of company policy. (Def.'s Reply, at 11-12.) Pickett's testimony that Zeller told her, "I think it's best if we part ways" because of his perception that she was not "comfortable with what's going on" (Pl.'s 56.1 ¶¶ 54, 56) creates a dispute of fact on this issue. As in *Paz v. Wauconda Healthcare and Rehabiliation Centre, LLC*, 464 F.3d 659, 665 (7th Cir. 2006), "the parties still sharply disagree as to whether [the plaintiff] was fired or abandoned her job." Plaintiff asserts that Zeller made explicit reference to her discomfort and inability to "handle" what was happening; although he denies having made such statement, the court credits Plaintiff's version of events for purposes of this motion. (Pl.'s 56.1 ¶¶ 44-46, 54, 56.) Summary judgment on Plaintiff's retaliation claim is denied.

### III.    Damages

If the jury concludes that Plaintiff was in fact a victim of retaliation, the court notes that her damages appear to be limited to a single month's pay. It is undisputed that Defendant offered to reinstate her beginning in July 28, 2008. Although Defendant did not offer to reimburse Plaintiff for her lost pay, Defendant also did not make its offer contingent on Plaintiff's waiver of her claim for lost pay. *See Ford Motor Co. v. EEOC,* 458 U.S. 219 (1982) (an employer charged with discrimination can "toll the accrual of backpay liability by unconditionally offering the claimant the job he sought."); *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1203 (7th Cir. 1989) (an employee's refusal to accept a reasonable offer of reinstatement tolls the employer's liability for back pay).

**CONCLUSION**

For the reasons stated here, Defendant's motion for summary judgment (18) is granted in part and denied in part. The parties are urged to consider a settlement.

ENTER:

Dated: March 14, 2008

_____
REBECCA R. PALLMEYER
United States District Judge