**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DANIELLE L. PICKETT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 07 C 1722 |
| | ) |
| SHERIDAN HEALTH CARE CENTER, | ) Judge Rebecca R. Pallmeyer |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Danielle Pickett is a housekeeper for the defendant, Sheridan Health Care Center ("Sheridan"), a nursing home for elderly people with physical and mental infirmities. Pickett alleged that she was sexually harassed by residents at Sheridan, and that on June 30, 2006 Sheridan, in violation of Title VII, terminated her in retaliation for her complaints about these incidents. Concluding that Sheridan had taken affirmative steps to address the sexual harassment, the court granted summary judgment on that claim, but proceeded to trial on Pickett's retaliation claim. On September 3, 2008, the jury entered a verdict for Pickett and awarded her compensatory damages for emotional distress in the amount of $15,000 and punitive damages in the amount of $50,000. Sheridan has moved for a new trial or remittitur of the damage award. Pickett has moved for further equitable relief including back pay with interest, an injunction against further discrimination, expungement of her personnel file, and transfer to a different department. For the reasons explained here, Sheridan's motion is denied and Pickett's motion is granted in part and denied in part.

## FACTS[1]

Pickett is a resident of Zion, Illinois, where Sheridan is also located. (Tr. 196:20; 145:9.) Pickett began working for Sheridan on January 10, 2005 as a dietary aide and was transferred in

---

[1] The facts are drawn exclusively from the trial transcript of witness testimony and from exhibits introduced at trial.

September of that year to a position in housekeeping. (Tr. 197:6, 8; 225:13.) Pickett testified that Sheridan's residents subjected her to lewd remarks and inappropriate touching on two occasions between November 2005 and January 2006. (Tr. 200:19-22.) Sheridan responded by instructing Pickett not to clean those residents' rooms alone. (Tr. 233:4-11.) Finally, on June 24, 2006, a third incident occurred in which a resident cornered and groped Pickett. (Tr. 201:1, 23.) The police were called to respond to this incident the following day, but Pickett decided against filing a report with them. (Tr. 203:7.)

On June 27, 2006, Pickett, her union representative, and several managers including Sheridan's administrator, Paul Zeller, met to discuss the third incident and determine a remedy for the problem. (Tr. 204-05.) Pickett testified that she felt intimidated at that meeting and that some of the managers suggested that she had invited the resident's conduct. (Tr. 205:2-20.) It was agreed that Pickett would be reassigned to clean the first floor of the building, where no residents live, in order to minimize her contact with them. (Tr. 236:1-14.) No mention was made of any disciplinary action against Pickett, and she herself agreed to the reassignment. (Tr. 236:3-16.)

The next morning, June 28, 2006, Pickett met alone with Zeller in his office to further discuss Sheridan's response to the June 24th incident. (Tr. 210:21-25.) Zeller and Pickett testified to conflicting versions of what was said during the meeting, but it is clear that Pickett was dissatisfied that Sheridan had not removed the resident from the facility. (Tr. 157:10-21.) Presumably putting herself in the role of a customer of Sheridan, Pickett urged that such action should be taken, telling Zeller, "the customer is always right." (Tr. 157:24) Pickett testified that Zeller responded to this comment by suggesting that "maybe [she] should go clean some stores," and that this caused her to fear that her job was in jeopardy. (Tr. 211:1-3; 212:15-17.) Zeller himself denied recollection of that statement. (Tr. 158:2.) Pickett became upset and began to cry (tr. 158:25; 211:5), and according to her testimony, she then told Zeller that her children were depending on her and that she did not want to lose her job with Sheridan. (Tr. 211:10-13.) Directly

2

after her meeting with Zeller, Pickett left work and went home without informing the management at Sheridan or asking permission.  (Tr. 243:17-25.)

Not sure of her employment status, Pickett called Zeller the next day, June 29, 2006, to confirm and explain that she understood that she should not have walked out, but had done so because she was upset.  (Tr. 214:19-25; 215:1.)  Zeller told her that he would have to discuss her conduct in walking off the job with Sheridan's vice president of operations, one Mrs. Paynter.  (Tr. 161:16-18; 215:2-3.)  Zeller called Pickett back on June 30 and informed her that he was terminating her employment.  (Tr. 215:19-20.)  Zeller apparently did not give Pickett a specific reason for this decision, merely relating that it was "best [Pickett and Sheridan] part ways."  (Tr. 162:7.)  At trial, Zeller testified that Pickett had been terminated for abandoning her job.  (Tr. 167:21-22.)

Zeller testified that Pickett filed a discrimination claim with the E.E.O.C. "three or four weeks later."  (Tr. 167:25.)[2]  According to Zeller, about a week after receiving notice of this claim, on or about July 28, 2006, Sheridan or its attorneys offered to allow Pickett to return to her former employment.  (Tr. 168:7-12; 244:4.)  The offer was not conditioned on Pickett dropping her legal claim, (tr. 244:14), but she refused it.  At trial, Picket explained that she turned the offer down because it did not include back pay for the time since the June 30th termination and because she was unsatisfied with Sheridan's approach to reducing her potential exposure to further offensive behavior.  (Tr. 244:19-24.)  Sheridan repeated the offer on August 23, 2006 and again on September 25, 2006, but Pickett refused each time.  (Tr. 245:25; 260:4.)  Pickett finally accepted the offer on or about January 9, 2007 and returned to work on January 23d.  (Tr. 261:20; 262:8.)

Pickett testified that though she held some odd jobs between June 30, 2006 and January 23, 2007 (tr. 268), she was unable to pay her bills, was nearly evicted from her apartment

---

[2]  The court notes that the E.E.O.C. charge attached to the complaint appears to have been filed on July 7, 2006.

3

and was forced to rely on charities for food, clothing, and Christmas gifts for her children. (Tr. 217: 12-25.) Pickett also testified regarding the distress she experienced; she explained that her upbringing had caused her to be reluctant to seek public assistance, and that she felt badly that her children saw her out of work. (Tr. 221:3-11.) Pickett admitted that she did not seek medical attention for emotional distress in the time between her termination and first offer of reinstatement or at any other time. (Tr. 264:9.)

Sheridan maintains a staff of 230 employees. (Tr. 145:18.) Prior to Pickett's termination, it had posted information about the federal laws on employment discrimination (tr. 166:13-23), and supplied its employees with a handbook detailing its own employment policies (tr. 164:9-22), and a copy of its anti-retaliation policy. (Tr. 148:19.)

**I.    New Trial**

The court may order a new trial pursuant to FED. R. CIV. P. 59(a) "if the jury's verdict is against the clear weight of the evidence or the trial was unfair to the moving party." *David v. Caterpillar, Inc.*, 324 F.3d 851, 863 (7th Cir. 2003). The court does not independently re-assess whether the plaintiff has met her burden of proof, but rather determines whether there is a "reasonable basis" for the jury's verdict. *See Moore v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008); *cf. Harvey v. Office of Banks and Real Estate*, 377 F.3d 698, 708 (7th Cir. 2004) (explaining that after the jury delivers its verdict, the court must drop the *McDonnell Douglas Corp. v. Green*, 411 US 792, 802–03 (1973), burden-shifting framework and look instead to the "totality of the evidence").

Sheridan asserts that it is entitled to a new trial because (1) the evidence of retaliation was insufficient to support the jury's verdict; (2) admission of evidence pertaining to details of the third-party conduct animating Pickett's sexual harassment claim was erroneous and prejudicial; and (3)

some of Plaintiff's counsel's statements to the jury in closing were improper and prejudicial.[3] As explained below, the court concludes that none of these factors warrants disturbing the jury's verdict.

### A. Sufficiency of the Evidence

An employee can prove retaliation by showing that her employer subjected her to an adverse employment action because she had engaged in a statutorily protected activity. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008). Sheridan argues that there is insufficient evidence from which to infer a causal link between Pickett's protected activity and the adverse employment action because Sheridan had a legitimate reason to terminate Pickett. Specifically, Sheridan points out that she left work before the end of her shift without punching out.[4] (Def.'s Br. 6.) Whether Sheridan was technically entitled to terminate an employee for walking off the job is not dispositive, however. The issue for the jury is what actually motivated the defendant to terminate her employment, *Gates*, 513 F.3d at 691; in this case, the jury was entitled to disbelieve Defendant's witnesses and conclude that its motivation was in fact retaliatory. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000). Although Pickett pursued the "direct method" of proving retaliation, *see Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002), the jury was free to consider all the evidence, including circumstantial

---

[3] Sheridan also asserts that it is not liable for retaliation as a matter of law. In support of its motion for summary judgment on Pickett's sexual harassment claim, Sheridan argued that it could not be liable for Pickett's harassment at the hands of third-party non-employees. In granting the motion on other grounds, the court rejected this argument. *Pickett v. Sheridan Health Care Center*, 2008 WL 719224, *3 (N.D. Ill.)). In any event, assuming that Sheridan is not liable for the offensive conduct of its residents, Sheridan has not satisfied the court that it cannot be found liable for retaliating against Pickett for complaining about the conduct.

[4] Sheridan also argues that Pickett's complaints about the incidents in 2004 and 2005 are not causally connected to the decision to terminate her on June 30th, 2006 because of their temporal distance from the adverse employment action. The passage of time does not necessarily foreclose the possibility that the termination was in response to a long-term pattern of complaints, however; nor was Pickett required to prove a causal connection with the first two incidents in order for the jury to find retaliation for her complaints about the third incident alone.

evidence.  *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006) (citing *Sylvester v. SOS Children's Vills. of Ill.*, 453 F.3d 900, 902 (7th. Cir. 2006)).

The evidence that Sheridan retaliated against Pickett may not be overwhelming, but neither was it so insubstantial that the jury's verdict "cries out to be overturned."  *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995) (citing *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991)).  Indeed, the jury may infer retaliatory intent even from an employer's ambiguous statements that might plausibly have been susceptible to an interpretation more favorable to the employer.  *See Soto v. Adams Elevator Equipment Co.,* 941 F.2d 543, 552 (7th Cir. 1991).  If the jury believed Pickett rather than Zeller regarding the substance of their conversation on the morning of June 28, 2006, then it could have reasonably inferred that in telling Pickett that "maybe [she] should go clean some stores," (tr. 211:1-3), Zeller was suggesting that she quit working for Sheridan.  Given the context of the conversation,[5] the jury could also reasonably infer that Sheridan's frustration with Pickett's repeated complaints motivated this suggestion.  Sheridan's evidence to the contrary, namely Zeller's denial of Pickett's version of the June 28th conversation, is not clearly of greater weight, and the jury was not required to find it credible.

Furthermore, the content and general tone of Sheridan's Employee Handbook provides evidence from which the jury could reasonably have concluded that Sheridan would normally be reluctant to abruptly terminate someone in Pickett's position under these circumstances. According to its Handbook, Sheridan is a place where "communication is open and problems can be discussed and resolved in a mutually respectful atmosphere . . . tak[ing] into account individual circumstances and the individual employee."  (Pl.'s Ex. 3 at 4.)  The conciliatory language of this policy might have led the jury to conclude that Sheridan would not readily terminate an experienced employee who had no other job performance issues (tr. 191:5), and who, if she is to be believed,

---

[5] The parties do not dispute that Pickett and Zeller met to discuss the June 24, 2006 incident and the remedy proposed at the follow-up meeting on June 27th. (Tr. 150-60.)

was acutely distressed—"humiliated, embarrassed" and in tears—about the June 24th incident and its aftermath. (Tr. 213:8-12.) And again, the jury need not have believed Zeller's assertion that he would have fired anyone who had left work as had Pickett. (Tr. 180:22–223.)

Taken together, these facts constitute a sufficiently "convincing mosaic of circumstantial evidence" from which a jury could infer that Pickett was terminated for complaining about sexual harassment. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (internal quotations omitted) (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)).

### B. Prejudice

Sheridan moved in limine to exclude all evidence of the conduct of the nursing home residents underlying Pickett's sexual harassment claim. In ruling on the motion, the court agreed that a detailed recounting was unnecessary, but permitted Plaintiff to offer a cursory presentation of the circumstances surrounding the incidents in order to support her claim that she had opposed an unlawful employment practice as required by law. 42 U.S.C.A. § 2000e-3(a). Pickett's counsel remained well within the limits set by the court when questioning Pickett about the incidents. He asked just two questions pertaining to the behavior of the residents, to which Pickett responded with brief, concise answers, and then quickly moved on to questions regarding the conduct of Sheridan's managerial staff in the aftermath of the third incident, which was directly relevant to Pickett's retaliation claim. (Tr. 200:5-25.) The court stands by its earlier ruling. Admission of this evidence was not error, and even if it had been, such error was harmless because Pickett's brief account was not particularly graphic and the vast majority of testimony presented to the jury concerned the conduct of Sheridan's management in the days surrounding Pickett's termination.

Sheridan also argues that it is entitled to a new trial because some of Pickett's attorney's comments in closing were improper and prejudicial.[6] Sheridan's attorney did not object at the time,

---

[6] Sheridan also advances this argument in support of its alternative request for (continued...)

however, and thus waived this argument. *Soltys v. Costello*, 520 F.3d 737, 745 (7th. Cir. 2008). Even if the court were to entertain this argument, it is well settled that "'improper comments during closing argument rarely rise to the level of reversible error.'" *Miksis v. Howard*, 106 F.3d 754, 764 (7th Cir. 1997) (quoting *Doe v. Johnson*, 52 F.3d 1448, 1465 (7th Cir. 1995)) (affirming refusal to grant new trial for improper statements despite the district court's recognition that plaintiff's counsel's speculation about salaries earned by opposing attorneys was improper). In support of his case for punitive damages, Pickett's attorney suggested that an award of a few thousand dollars would be unlikely to have a significant impact on Sheridan, given the size of its operation. Though no evidence of Sheridan's financial status was presented at trial beyond the number of people it employed, the jury was instructed that comments of the attorneys are not evidence. The court presumes that juries follow their instructions. *Soltys*, 520 F.3d at 744 (citing *Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 702 (7th Cir. 2007)). Regardless of whether it was improper to speculate in his closing argument as to the probable effect on Sheridan of an award of damages, counsel's comments were not so prejudicial as to warrant a new trial.

### C. Compensatory Damages

The jury awarded Pickett $15,000 in compensatory damages for her emotional distress. In reviewing an award for compensatory damages, the court considers whether the award is (1) monstrously excessive;[7] (2) rationally connected to the evidence; and (3) roughly comparable to awards made in similar cases. *David*, 324 F.3d at 864. Sheridan argues that the jury's award for Pickett's non-pecuniary damages is not rationally connected to the evidence because it was her

---

[6] (...continued)
remittitur of the damages. The court's reasoning above applies in this context as well.

[7] "The monstrously excessive inquiry is a vague one that may simply be another way of asking whether there is a rational connection between the award and evidence." *Harvey*, 377 F.3d at 713-14 (internal quotations omitted) (citing *E.E.O.C. v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1285 n. 13 (7th Cir. 1995)).

refusal to accept its offers of reinstatement that led to her financial distress and inconvenience.

While much of Pickett's testimony regarding her emotional distress describes problems in her life that undoubtedly developed after Sheridan's July 28, 2006 offer of reinstatement, Pickett does not rely exclusively on this evidence. Even if she had been obliged to accept Sheridan's offer, Pickett testified that her unemployment was embarrassing, (tr. 218), and that she felt shame due to her inability to present herself as a role model to her children. (Tr. 221.) Furthermore, the agitation and fear she displayed at Zeller's suggestion at the June 28th meeting that she leave Sheridan's employ provided evidence of the emotional toll her termination days later would have. Sheridan notes that Pickett failed to seek medical treatment or counseling for her distress. That observation is immaterial at this point, because a plaintiff's testimony alone may support an award for emotional distress, *Merriweather v. Family Dollar Stores of Ind., Inc.*, 103 F.3d 576, 580 (7th Cir. 1996), and the jury was entitled to credit Pickett's own assessment of her injuries. *Deloughery v. City of Chicago*, 422 F.3d 611, 620 n. 5 (7th Cir. 2005) (jury entitled to conclude plaintiff need not consult mental health professional).

In comparison with awards made in similar cases, $15,000 is a typical, even conservative value. By one court's estimation, the awards in cases involving improper terminations range as high as $50,000 to $100,000. *Deloughery v. City of Chicago*, 2004 WL 1125897, *7 (N.D. Ill. 2004) (correcting for inflation the figures determined in *Webb v. City of Chester*, 813 F.2d 824 (7th Cir. 1986)). Awards affirmed for more contemporary retaliation claims alleging emotional distress corroborate this range. *Harvey*, 377 F.3d at 704, 714 (upholding compensatory awards of $50,000, $100,000, and $150,000 for independent instances of retaliation); *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 484 (7th Cir. 2003) (approving a compensatory award of $75,000 though the plaintiff had found work after two months); *Tullis v. Townley Eng'g & Mfg. Co.*, 243 F.3d 1058, 1068-69 (7th Cir. 2001) (affirming a compensatory award of $80,185.68 for a plaintiff who felt "low" and "degraded" after being laid off and had been unemployed for nine to ten months). Given the

evidence of emotional distress and the modesty of the jury's award, it cannot be said that the compensatory damages lack a rational connection to the evidence. The court thus declines to vacate the award or modify the amount.

### D. Punitive Damages

Sheridan also submits that the evidence does not support the jury's award of $50,000 in punitive damages. As in reviewing a compensatory damages award, the court's role is merely to determine whether the punitive damages award is consistent with what the evidence would permit a rational jury to find. *See Alexander v. City of Milwaukee*, 474 F.3d 437, 454 (7th Cir. 2007). A wrongfully terminated employee may recover punitive damages if she demonstrates that her employer engaged in unlawful discrimination with "malice" or "reckless indifference." 42 U.S.C. § 1981a(b)(1). Malice or reckless indifference may be found where the employer perceived a risk that its actions would violate federal law. *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 536 (1999).

Sheridan argues that the fact that it was able to produce a legitimate reason for terminating Pickett shows conclusively that it did not knowingly disregard the risk that it was violating Title VII. But the jury's verdict for Pickett on her retaliation claim reflects that it did not believe Sheridan terminated Pickett for a legitimate reason. Moreover, the jury heard testimony that information on federal employment discrimination law was posted in Sheridan's building, (tr. 166:13-23), and was directed to Sheridan's anti-retaliation policy. (Tr. 148:19.) From this evidence, as well as the short time between notice to Sheridan of Pickett's EEOC charge and Sheridan's first offer of reinstatement, it was not unreasonable for the jury to conclude that Sheridan knew it might be retaliating against Pickett in violation of federal law when it decided to terminate her. The court declines to disturb an award of punitive damages that has firm evidentiary support.

**II.     Equitable Relief**

Pickett moves to amend the judgment pursuant to FED. R. CIV. P. 59(e). Specifically, she requests further equitable relief in the form of (1) back pay with interest; (2) an injunction restraining Sheridan from further violations of Title VII; (3) an order for removal of references to this suit from her personnel file; and (4) an order forcing Sheridan to transfer Pickett from housekeeping to the dietary department. The court has broad discretion under 42 U.S.C. § 2000e-5(g) to craft equitable relief necessary to make whole a plaintiff who has won a verdict in her favor. *Miles v. State of Indiana*, 387 F.3d 591, 599 (7th Cir. 2004).

**A.     Back Pay**

Pickett argues that she is entitled to an award of $9,437.49 for 31 weeks of unemployment between June 30, 2006 and January 23, 2007, as well as $1,051.49 in prejudgment interest, deducting $100 as interim earnings. Sheridan concedes that Pickett is entitled to $1,224 with interest for the four weeks between June 30, 2006 and July 28, 2006, the date of its offer of re-employment, but no more.

An employee terminated wrongfully under Title VII may be awarded back pay at the court's discretion, but the employee is also obliged to mitigate her damages by using reasonable diligence to obtain interim employment. 42 U.S.C. § 2000e-5(g). Consequently, the employee's refusal of an offer of reinstatement tolls the accrual of back pay to the date of the offer. *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 228-29 (1982). The employee is not, however, required to accept unreasonable offers that are, for example, insufficiently specific or obviously inferior to the terms of her former employment. *See Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1203 (7th Cir. 1989). In Plaintiff's brief in support of her motion to amend the judgment to include back pay, Pickett asserts that (1) she was not obliged to accept Sheridan's initial offers because they did not sufficiently specify the terms of employment; (2) employees remained exposed to the nursing home residents' offensive behavior at the time she received the offer; and (3) when she did finally accept

11

Sheridan's offer, she was given demeaning tasks and subject to her co-workers' hostility. The court is not moved by any of these arguments.

Pickett's own testimony at trial belies her claim that she declined Sheridan's offer because it was insufficiently specific. When asked why she refused, Pickett did not answer that the terms were too vague or that she was afraid she would have to take a position that was significantly inferior to the one from which she was terminated. Rather, Pickett testified that she refused the offer because it did not include back pay and because Sheridan had yet to conform to her views on how to handle her exposure to the potentially offensive behavior of the residents. Moreover, at her deposition she mentioned only the former reason. (Tr. 244:18-21.) The Supreme Court has declared in *dictum* that an offer of reinstatement is not unreasonable per se merely because it does not include back pay accrued to that point. *Ford,* 458 U.S. at 232–33 n. 19 (reasoning that the employee would certainly be obliged to accept an identical offer from a different employer, and that offer naturally would not include back pay). An additional evidentiary hearing on the specificity of Sheridan's offer is unnecessary. The court will not entertain arguments that are inconsistent with Pickett's sworn testimony.

Pickett appears to believe that her refusal to return to work was justified because of her fear that the inappropriate behavior of some residents might continue, but the court's summary judgment ruling forecloses that argument. The court held that notwithstanding Pickett's subjective feelings about Sheridan's remedial steps, it was not liable for sexual harassment because it had made a reasonable effort to isolate Pickett from the residents who had been causing the problems. *Pickett v. Sheridan Health Care Center*, 2008 WL 719224, at *5 (N.D. Ill. 2008) (citing *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 535 (7th Cir. 1993)). In its July 28, 2006 offer, Sheridan proposed to return Pickett to the first floor of its building where no residents lived, an assignment to which Pickett had agreed before she was terminated. The court will not now conclude that the same conditions that were reasonable at the time Pickett was terminated were unreasonable a month

12

later.

Finally, as the court concluded earlier, the nature of Pickett's working conditions after she accepted Sheridan's offer and returned to work on January 23, 2007 is irrelevant. (Minute Order entered 9/03/08, Docket Item # 72.) Her present working conditions could not have informed her decision to turn down her previous offers. Pickett's allegations that her tasks were more menial than her original duties and that she was subject to further harassment by her supervisor and fellow employees are more appropriately the substance of an independent hostile work environment claim.

Reasonable diligence obliged Pickett to mitigate her back pay damages by accepting Sheridan's unconditional offer of reinstatement. She is entitled to $1,224 of back pay for her unemployment from June 30, 2006 to July 28, 2006. Pickett worked a number of low-paying, temporary jobs between June 30, 2006 and January 23, 2007, earning "under a thousand [dollars]" in total. (Tr. 268:23.) An estimated range of $500-$600 for her total interim earnings, evenly distributed over the period of her unemployment, is consistent with the evidence. Thus, a deduction from the pack pay award of $100 for the month preceding Sheridan's first offer is also required. With interest of $133.42 on the corrected amount,[8] the total comes to $1,357.42.

### B. Injunctive Relief

Injunctive relief should be granted when it is necessary to foreclose the possibility that the employer will engage in discriminatory conduct in the future. *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 864 (7th Cir. 2001). It may be appropriate even when the employee presents no more evidence of discrimination than that which supported their original claim. *Id.* In *Bruso*, the plaintiff won a verdict on his retaliation claim. The trial court denied his requests for expungement of references to the dispute underlying his claim from his personnel file and for an injunction against

---

[8] Sheridan concedes a 5 percent per annum simple interest rate. The court applied this rate to the sum of $1,124 over the 797-day (2.18-year) period between Pickett's termination on June 30, 2006, and entry of the verdict on September 3, 2008.

further retaliation. Even under the deferential abuse of discretion standard, however, the Seventh Circuit reversed, reasoning, with respect to the district court's refusal to expunge, that a record of an employment dispute could potentially cloud an employee's entire career. *Id.* at 863. With respect to the district court's denial of the injunction, the Court of Appeals explained that the defendant had not offered any evidence suggesting that future retaliation was no longer possible, given that the plaintiff remained employed by the defendant and that some of the managers responsible for the retaliatory conduct were also still present. *Id.* at 864.

The situation in Pickett's case is similar. She is currently employed at Sheridan, and though Paynter has departed, Pickett apparently remains under Zeller's supervision. While Sheridan has taken appropriate steps to minimize the danger of sexual harassment, she remains exposed to further retaliation and faces the possibility that records in her personnel file will color her future treatment. Therefore, Sheridan shall be permanently enjoined from retaliating against Pickett and shall expunge her personnel file of all records pertaining to her lawsuit as well as any others reflecting her complaints of sexual harassment.

Turning to Pickett's request for a court-ordered transfer to the dietary department, the court has already determined that Pickett's assignment to the first floor, where her housekeeping duties include cleaning the elevator, was a reasonable step to minimize her exposure to the inappropriate behavior of a few of Sheridan's residents, not an unlawful act of retaliation. *See Pickett*, 2008 WL at *5. Pickett agreed to this assignment before she was terminated. (Tr. 236:1-15.) Pickett does not allege that Sheridan had any discriminatory motive in moving her from the dietary department to housekeeping in September 2005, a transfer made at her own request. (Tr. 228:3.) To order Pickett's transfer back to the dietary department would go beyond making her whole; it would put her in a better position than she had held prior to her termination. The court thus declines to order Sheridan to transfer Pickett to the dietary department.

**CONCLUSION**

For the foregoing reasons, Sheridan's motion for a new trial on the issue of liability under Title VII for retaliation and for a new trial or remittitur on the issue of damages [78] is denied. Pickett's motion for further equitable relief [80] is granted in part and denied in part. Pickett is awarded back pay and interest in the amount of $1,357.40 and Sheridan is enjoined from further retaliation against Pickett and required to expunge Pickett's personnel file as directed herein. Plaintiff's request for an order transferring her to a different department is denied.

ENTER:

Dated: August 4, 2009

_____
REBECCA R. PALLMEYER
United States District Judge